FILED - USDC - NDTX - SA
JUL 21 '26 PM4:11 KR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

**KEVIN WAYNE ASHBY,**
Plaintiff,

v.

**DETECTIVE JAMES ANDREW WELLS,**
Badge No. 620, individually; and
**CITY OF BROWNWOOD, TEXAS,**
Defendants.

**Civil Action No.** 6:26-cv-00255-H-BU

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Kevin Wayne Ashby, proceeding pro se, files this Original Complaint against Detective James Andrew Wells, individually, and the City of Brownwood, Texas, and alleges as follows:

## I. INTRODUCTION

1. Plaintiff Kevin Wayne Ashby brings this civil-rights action under 42 U.S.C. Section 1983 against Brownwood Police Detective James Andrew Wells, individually, and the City of Brownwood, Texas. The action concerns the July 25, 2024 arrest warrant Wells obtained for aggravated assault with a deadly weapon and the arrest, detention, bond, publication, and other injuries that followed.

2. The reported event occurred on July 7, 2024, inside the residence shared by Plaintiff and his then-wife, McKinze Ashby. Plaintiff and McKinze were the only two people physically

present. McKinze was identified by the Brownwood Police Department as the alleged victim and was the only accusing eyewitness who could see Plaintiff, the knife, either person's actions, and the object involved.

3. Two other people supplied information but did not witness the physical event. Corporal Ian Baker arrived afterward and wrote a patrol report summarizing an oral account attributed to McKinze. Brandi Egger, McKinze's mother, was outside Brownwood, driving, and participating by telephone. Brandi could hear portions of the disagreement but could not see either person, the knife, their movements, or the object involved.

4. After speaking with Baker during the initial police response, McKinze personally wrote and signed a Statement of Facts certifying her own account. In sequence, she wrote that "things got worse because I called my mother"; that Plaintiff "left the room got a knife came back and stabbed some wood" while still telling her to "hang up the phone or move out"; that he had the knife pointed at her, which scared her; and that she asked, "if your gonna stab me why do you want me in your life." The statement therefore used "stab" to describe contact with wood and in McKinze's own conditional question. It did not quote Plaintiff threatening to stab or otherwise injure her.

5. McKinze's signed account materially differed from Baker's unwitnessed summary. Baker attributed to her that Plaintiff already carried a large tanto-style knife on his side, pulled it from his waistband, advanced to within twelve to eighteen inches, continued pointing it to force her off the telephone, and began stabbing the kennel after she refused. Brandi supplied additional quotations, conclusions, and predictions that appeared in neither McKinze's signed statement nor Baker's report. No single source supplied the complete threatening sequence Wells later presented to the magistrate.

6. Wells's sworn complaint says he began his investigation by reading Baker's patrol report. It then reduces Wells's contact with McKinze to her supposed unwillingness to pursue charges and devotes its only detailed follow-up account to Brandi. It never identifies, quotes, summarizes, or attaches McKinze's signed Statement of Facts, even though she was the alleged victim, the only accusing eyewitness, and the person whose supposed account was being used to establish the felony.

7. Wells also stated that "McKinzie"[1] became scared and therefore called Brandi, although no source supplied that causal fact. McKinze's signed chronology placed the call before Plaintiff left the room and obtained the knife and stated that the disagreement became worse because she called her mother. Wells spoke with McKinze for approximately one minute, conducted no documented substantive follow-up with her, never interviewed Plaintiff before seeking the warrant, interviewed Brandi instead, and then waited approximately fifteen more days while Plaintiff and McKinze continued openly living together and BPD sought no emergency separation.

8. Plaintiff's account of the wood contact, which Wells did not obtain before the warrant, is that the kennel was metal with a separate board resting on top; Plaintiff tried to stick the knife into the board, it did not remain the first time, and he placed it a second time so it would stay. After the arrest, Plaintiff demanded an interview, and McKinze later repeatedly denied that Plaintiff threatened her. BPD did not correct the referral or the police-supplied public narrative.

9. Plaintiff alleges judicial deception, not merely an imperfect investigation. He alleges that Wells omitted the only eyewitness's signed account, concealed the immediate conflict between that statement and Baker's summary, inserted a fear-caused-call fact no source supplied, elevated

[1] *Plaintiff reproduces quotations, dates, spellings, and other wording from investigative records and warrant materials exactly as they appear unless otherwise indicated.

Brandi's remote and uncorroborated allegations, and assembled an intentional knife threat from incompatible fragments. Plaintiff also alleges municipal liability based on command-level notice, summary closure of his evidence-backed complaint, failure to preserve or correct the record, and a later recurrence of the same investigative method.

## II. PARTIES

10. Plaintiff Kevin Wayne Ashby is a citizen of the United States and a resident of Brown County, Texas.

11. Defendant James Andrew Wells was at all relevant times a detective employed by the Brownwood Police Department ("BPD") and acted under color of state law. He is sued in his individual capacity.

12. Defendant City of Brownwood, Texas is a Texas home-rule municipality that operates BPD and employed Wells, Assistant Chief James Fuller, and the other officers described below.

## III. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. Sections 1331 and 1343 because this action arises under the Fourth Amendment and 42 U.S.C. Section 1983.

14. Venue is proper in the Northern District of Texas, San Angelo Division, under 28 U.S.C. Sections 124(a)(4) and 1391(b) because Brown County lies in this Division and the events giving rise to the action occurred in Brownwood, Texas.

## IV. NO COLLATERAL ATTACK / HECK-SAFE LIMITATION

15. Plaintiff's later October 2025 disposition was for Repeated Violation of a Court Order or Condition of Bond. Plaintiff was never indicted for aggravated assault with a deadly weapon in either aggravated-assault matter described below and did not plead guilty to either aggravated-assault offense.

16. The two aggravated-assault matters were separate 2024 police investigations completed and forwarded to the Brown County District Attorney's Office before the later disposition. They were later listed as matters taken into consideration in connection with that separate disposition.

17. Consistent with Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), Plaintiff does not ask this Court to invalidate, modify, disturb, or undermine the later plea, deferred adjudication, probation conditions, protective orders, or any family-court order. Plaintiff does not ask this Court to decide whether separate conduct violated a court order or bond condition.

18. Plaintiff's claims concern independent police conduct occurring before the later disposition: preparation and presentation of the July 2024 warrant, the resulting arrest and seizure, the police-created public narrative, command-level complaint handling, and the later recurrence. Success does not require a finding that the separate court-order or bond-condition disposition was invalid. Family-court, employment, reputational, and parent-child consequences are pleaded only as damages caused by the challenged police conduct.

## V. FACTUAL ALLEGATIONS

### A. The July 7 event and the people who supplied information

19. Plaintiff and McKinze were the only two people physically present during the disputed event. Brandi contacted BPD from outside Brownwood while traveling toward Corpus Christi and driving during the telephone communications. She could not see Plaintiff, McKinze, the knife, either person's actions, or the object later described as a kennel.

20. Brandi's initial report that Plaintiff was inside threatening McKinze with a knife was therefore a remote conclusion, not an eyewitness observation. Wells knew from the patrol report that Brandi was not present. A neutral presentation would have identified the limits of her knowledge instead of allowing her accusation to read like firsthand evidence of a knife threat.

21. Brandi also supplied a physical-scene claim that was incompatible with the officers' own information. Dispatch stated that Plaintiff was no longer present but had parked the Suzuki behind McKinze's other vehicle so she could not leave. Plaintiff and McKinze had only two vehicles, and Plaintiff had already departed in the Suzuki. BPD's call sheet noted that the suspect vehicle was not present. The Suzuki could not simultaneously be gone with Plaintiff and remain behind to block the other vehicle.

22. That impossible vehicle account was an immediate warning that Brandi was supplying scene details she could not see. Wells nevertheless relied extensively on her account and did not disclose this demonstrated reliability problem to the magistrate.

23. The patrol report documented that the disagreement involved McKinze's brother, who had sexually assaulted her earlier in life and was present at the family reunion. Plaintiff learned through communications involving McKinze and Brandi that the brother would be present. The known subject was therefore materially different from the later warrant claim that Plaintiff became enraged merely because McKinze attended a family function.

24. Brandi was not a detached source. Plaintiff alleges that she opposed his continued relationship with McKinze and wanted him removed from McKinze's life. The pre-warrant records at minimum showed that Brandi was directly involved in the underlying family conflict and remained involved by telephone during the disagreement. Wells did not meaningfully investigate or disclose that potential bias before treating her remote accusations as corroboration.

25. Baker arrived after the disputed conduct and did not witness it. He spoke with McKinze and then prepared a patrol report summarizing an oral account attributed to her.

26. After speaking with Baker, McKinze personally completed and signed a handwritten Statement of Facts. Directly above her signature, she certified that the information was true and

correct and was supplied for the investigation. Her signed statement was the only contemporaneous account personally written and adopted by either of the two people physically present.

27. McKinze wrote that she called her mother and that “things got worse because I called my mother.” She then wrote that Plaintiff left the room, got a knife, came back, and “stabbed some wood” while still telling her to “hang up the phone or move out.” She next wrote that Plaintiff had the knife pointed at her, which scared her.

28. McKinze then wrote that she asked, “if your gonna stab me why do you want me in your life,” after which Brandi said she was calling the police. McKinze's narrative therefore contained two distinct uses of the stabbing concept: her description that Plaintiff 'stabbed some wood” and her own conditional question about being stabbed. Neither was a statement that Plaintiff told her he would stab her.

29. The only direct command McKinze attributed to Plaintiff was to “hang up the telephone or move out”. Her signed narrative attributed no verbal threat of bodily injury to Plaintiff and did not state that the knife was being used to communicate an intention to injure her.

30. Baker’s summary attributed materially different and more incriminating facts to McKinze: that Plaintiff already had a large tanto-style knife in a belt sheath or waistband, drew it during the confrontation, moved within approximately twelve to eighteen inches, continued pointing it to make her end the call, and stabbed the kennel after she refused.

31. McKinze's signed statement, completed after Baker spoke with her, did not adopt Baker's waistband, advancement, precise-distance, coercive-purpose, or refusal-and-retaliation assertions. If Baker accurately recorded an earlier oral account, then the same witness gave materially incompatible accounts during the same initial response. If he did not, then his report

was inaccurate. Under either possibility, Baker's report did not corroborate the signed account and the conflict had to be disclosed.

32. Brandi supplied the warrant's most inflammatory material despite seeing none of the physical event. She attributed distinctive quotations to Plaintiff and McKinze; claimed Plaintiff stabbed the kennel because McKinze would not hang up; stated that McKinze was scared to death to leave Plaintiff; and predicted that Plaintiff might someday kill her.

33. Those quotations, causal claims, opinions, and predictions appeared only through Brandi. McKinze did not include Brandi's quoted pleas not to be touched or repeated knife statements in the signed account she personally wrote, Baker did not independently record them, and neither person physically present corroborated Brandi's remote version.

34. Plaintiff's account is that the kennel was metal and a separate board rested on top. He tried to stick the knife into the board, it did not remain the first time, and he placed it into the board a second time so it would stay. Wells never sought that explanation before the warrant because he never interviewed Plaintiff. Wells instead converted McKinze's phrase "stabbed some wood" into Plaintiff beginning to stab the top of a wooden dog kennel after McKinze refused to hang up.

35. The source record therefore did not consist of multiple witnesses describing one event. Only Plaintiff and McKinze were present. Plaintiff was not interviewed. McKinze personally signed an account materially different from Baker's summary. Brandi could not see the event and supplied allegations no other source confirmed.

36. Plaintiff left only after Brandi announced that she was calling police. He went to a nearby store, possessed a timestamped receipt, and called BPD dispatch twice at approximately 11:03 a.m. and 11:24 a.m. Incoming police calls appeared as "No Caller ID" and were

automatically silenced by Plaintiff's telephone setting; Plaintiff alleges he did not know those calls were from police. His own outgoing calls were inconsistent with knowingly evading contact.

**B. Wells's pre-warrant investigation**

37. On July 8, telephone records reflect a call between McKinze's telephone and Wells at approximately 10:09 a.m. lasting about one minute. McKinze was the alleged victim and the only accusing eyewitness. Plaintiff was beside her and heard her communicate, in substance, that nothing criminal had happened.

38. Wells reduced that approximately one-minute contact to a statement that "McKinzie" no longer wanted to pursue charges. He did not conduct a documented substantive interview, ask her to explain the statement she had personally written, reconcile it with Baker's materially different report, or contact her again before seeking the warrant.

39. The brevity of the contact is especially significant because Wells did not use McKinze's signed statement in the warrant. He neither obtained a meaningful follow-up account from the supposed victim nor disclosed the contemporaneous account she had already written and certified.

40. On July 10, Wells conducted his only recorded substantive pre-warrant witness interview with Brandi, the remote caller whose physical-scene claim was already incompatible with the officers' own information and whose distinctive allegations were absent from McKinze's signed statement.

41. During the entire eighteen-day pre-warrant period, Wells never interviewed Plaintiff, the only other person physically present. Plaintiff remained openly in Brownwood and continued

living at the known residence. When the warrant later issued, officers went directly there to arrest him, confirming that his location had never prevented an interview.

42. Wells did not recover or identify the knife, obtain forensic evidence, locate a neutral eyewitness, reconcile McKinze's signed statement with Baker's report, test Brandi's remote allegations against either on-scene participant, or document a reason for excluding the signed statement from the warrant presentation.

43. Wells waited approximately fifteen days after interviewing Brandi and eighteen days after the reported event before seeking the warrant. Throughout that period, Plaintiff and McKinze openly continued living together, and BPD sought no emergency separation or other immediate protective intervention.

44. The investigative sequence supports a reasonable inference of deliberate or reckless one-sidedness: approximately one minute with the alleged victim, no substantive follow-up with her, no interview of Plaintiff, one detailed interview with the remote source whose account made Plaintiff appear most guilty, and no effort to reconcile the conflicting records before seeking a second-degree-felony warrant.

**C. The July 25 warrant complaint**

45. On July 25, 2024, Wells signed a criminal complaint and obtained or caused issuance of a warrant charging Plaintiff with aggravated assault with a deadly weapon. In the charging sentence, Wells swore that Plaintiff "intentionally and knowingly threatened McKinzie with imminent bodily injury "by pulling a knife from his waist band and advancing toward McKinzie Ashby telling her to hang up the phone." That theory depended on the waistband, advancement, and coerced-hang-up facts that McKinze did not include in her signed statement. Bond was set at $50,000.

46. The sworn complaint stated that the offense occurred "on or about the 10th day of May 2024" and then stated that patrol was dispatched on "Friday June 7, 2024." McKinze's signed statement and the case records identify the event as July 7, 2024. Plaintiff does not contend that the incorrect dates, standing alone, invalidate the warrant. The warrant materials also repeatedly misspelled McKinze Ashby's first name. These errors, considered together, further illustrate that the source materials were not carefully reconciled before Detective Wells swore to a second-degree felony complaint. More importantly, despite these inconsistencies, Wells omitted the only contemporaneous signed statement personally written and certified by the alleged victim, even though that document was contained within the investigative file.

47. The presently available warrant file identifies Justice of the Peace Harold Hogan as the issuing magistrate. Discovery is necessary to determine whether Wells presented or attempted to present an earlier version to any other magistrate, whether any submission was returned or conditioned on additional facts, and whether the narrative was altered before Hogan signed it.

48. Wells expressly stated that he began his investigation by reading the patrol report. He then described his approximately one-minute contact with McKinze only as her no longer wanting charges and devoted the complaint's only detailed follow-up narrative to Brandi. The complaint never identified, quoted, fairly summarized, or attached the Statement of Facts McKinze personally wrote and certified after speaking with Baker.

49. First, the complaint repeated that the caller reported Plaintiff was inside threatening McKinze with a knife. It did not disclose that the caller was outside Brownwood, driving, and unable to see any part of the physical event. Brandi's conclusion was presented without the limitations that made it unreliable as evidence of an intentional threat.

50. Second, the complaint stated that Plaintiff became enraged because McKinze attended a family function. The patrol report documented that the disagreement involved the presence of McKinze's brother, who had sexually assaulted her earlier in life. Wells removed that known context and substituted a simplified motive that made Plaintiff appear irrationally possessive.

51. Third, the complaint stated that Plaintiff began arguing and became "more aggressive." That was a conclusion rather than a described act and supplied an escalating tone without identifying the conduct that supposedly communicated a threat of imminent bodily injury.

52. Fourth, Wells stated as fact that McKinze became scared and therefore called Brandi. No source supplied that causal fact. McKinze's signed statement said "things got worse because I called my mother" and placed the call before Plaintiff left the room and obtained the knife. Baker did not say fear caused the call, and Brandi could not see or know why McKinze placed it.

53. The fear-caused-call statement was material because it created the opening step in the warrant's escalation: Plaintiff frightened McKinze, her fear caused her to call for help, the call further enraged Plaintiff, and the confrontation then escalated to a knife. No witness supplied that sequence.

54. Fifth, the complaint stated that the call further enraged Plaintiff and that he then pulled a tanto-style knife from his waistband. McKinze's signed statement instead said Plaintiff left the room, got a knife, and came back. Wells selected Baker's more incriminating version and concealed the materially different chronology McKinze later wrote and certified.

55. Sixth, the complaint used Baker's assertion that Plaintiff pointed the knife while advancing within twelve to eighteen inches. Those details came from Baker's unwitnessed report. McKinze's signed statement, completed after Baker spoke with her, did not include them. Wells did not disclose the immediate conflict.

56. Seventh, the complaint stated that Plaintiff continued pointing the knife in order to make McKinze hang up. McKinze wrote that Plaintiff was still telling her to "hang up the phone or move out" and that he had the knife pointed at her, which scared her; she did not state that the purpose of the knife's orientation was to compel her to end the call. Wells supplied that coercive purpose and removed the alternative "or move out."

57. Eighth, the complaint stated that when McKinze did not hang up, Plaintiff began stabbing the top of a wooden dog kennel. McKinze wrote that Plaintiff came back and "stabbed some wood" while still telling her to hang up or move out. She did not state that a refusal caused the wood contact or that Plaintiff then began a retaliatory series of stabbings. Wells created the refusal-and-retaliation sequence.

58. Ninth, McKinze's statement referred only to "some wood". Plaintiff's account is that the kennel was metal, a separate board rested on top, and he placed the knife into the board twice because it did not remain the first time. Wells did not obtain that account before the warrant and described a wooden kennel being stabbed instead.

59. Tenth, the complaint relied on Brandi's statement that she 'was told' Plaintiff was angry because McKinze went to a family party to see her sons. Brandi did not identify who told her that and did not say McKinze supplied the motive. Wells used an unidentified secondhand assertion while omitting the materially different abuse-related context documented in the patrol report.

60. Eleventh, the complaint repeated distinctive quotations that appeared only in Brandi's account, including claims that McKinze repeatedly said Plaintiff had a knife and pleaded not to be touched. McKinze did not include those words in the signed statement she personally wrote, Baker did not independently record them, and no on-scene witness corroborated them.

61. Twelfth, the complaint included Brandi's opinions that McKinze was scared to death to leave Plaintiff and that Plaintiff might someday kill her. Brandi was not present and could not observe the physical event. Those opinions and predictions did not establish what Plaintiff intentionally communicated on July 7, and no other source corroborated them.

62. Thirteenth, the complaint reduced Wells's only pre-warrant contact with McKinze to a statement that she no longer wanted charges. It did not disclose that the call lasted approximately one minute, that Wells conducted no substantive follow-up with the alleged victim, that he omitted her signed statement, or that his only detailed follow-up interview was with Brandi.

63. Fourteenth, the complaint used flight or consciousness-of-guilt language without disclosing that Plaintiff went to a nearby store, possessed a timestamped receipt, called BPD twice, remained in Brownwood, continued living at the known residence, and alleges that anonymous incoming police calls were silenced by his telephone settings.

64. The complaint also omitted that Wells waited approximately fifteen days after interviewing Brandi and eighteen days after the event before seeking the warrant; that Plaintiff and McKinze remained openly together at the known residence; that BPD sought no emergency separation; that no neutral eyewitness corroborated an intentional threat; that no knife was recovered or identified; and that Wells never sought Plaintiff's explanation of the wood contact before swearing to the warrant.

65. These were not isolated wording choices. Wells omitted the only eyewitness's signed account, inserted the unsupported fear-caused-call fact, minimized his one-minute contact with the alleged victim, never interviewed the other person who was present, elevated Baker's materially different report, and devoted the complaint's detailed follow-up narrative to Brandi's

remote and uncorroborated allegations. He then combined those sources into a threatening sequence that no witness actually supplied.

**D. Corrected-affidavit analysis**

66. Under Franks v. Delaware and Fifth Circuit law, materially false or misleading statements must be removed, material omissions supplied, and probable cause evaluated on the corrected presentation.

67. A corrected presentation would begin with McKinze's signed Statement of Facts because she was the alleged victim, the only accusing eyewitness, and the only person physically present who personally wrote and certified a contemporaneous account. It would disclose that she completed that statement after speaking with Baker and that it materially differed from Baker's report.

68. The corrected presentation would remove Wells's statement that fear caused McKinze to call Brandi. No source said that. McKinze's chronology placed the call before Plaintiff left the room and obtained the knife and stated that the disagreement became worse because she called her mother.

69. The corrected presentation would accurately distinguish the two uses of the stabbing concept in McKinze's statement. She wrote that Plaintiff came back and "stabbed some wood," and she later asked the conditional question, "if your gonna stab me why do you want me in your life." Neither passage quoted Plaintiff threatening to stab her. The only direct command she attributed to Plaintiff was to hang up the telephone or move out.

70. Texas aggravated assault by threat required facts establishing that Plaintiff intentionally or knowingly communicated a threat of imminent bodily injury while using or exhibiting a

deadly weapon. A knife's presence, contact with wood, and McKinze's fear did not by themselves establish the required intentional or knowing communication of bodily harm.

71. McKinze's signed statement, standing alone, did not establish probable cause for aggravated assault by threat. Her narrative said that Plaintiff left the room, got a knife, returned, "stabbed some wood," continued telling her to hang up the telephone or move out, and had the knife pointed at her, which scared her. It did not quote Plaintiff threatening bodily injury or state that he used the knife to communicate that he would injure her. The statement about being stabbed was McKinze's own conditional question.

72. Baker's more incriminating additions could not be treated as corroboration without disclosing the same-day conflict. If Baker accurately summarized an earlier oral account, McKinze gave materially incompatible accounts during the same initial response. If he did not, his report was inaccurate. Either way, the magistrate was entitled to know that the signed and certified account did not adopt the details that supplied a waistband draw, advancement, precise distance, coercive purpose, and refusal-based retaliation.

73. Brandi's account likewise did not supply reliable corroboration. She saw none of the physical conduct, had already supplied a physical-scene claim incompatible with the officers' own information, had an apparent personal interest in Plaintiff's relationship with McKinze, and supplied distinctive quotations, causal claims, opinions, and predictions that neither on-scene participant corroborated.

74. Once the sources are separated rather than merged, the coherent threatening sequence in the warrant disappears. McKinze's signed account did not report Plaintiff making a bodily threat; Baker's materially different additions were disputed by the signed chronology; Brandi's unique

allegations were remote and uncorroborated; and Plaintiff's account was never sought before the warrant.

75. Wells's investigative choices reinforce the inference of deliberate or reckless selection rather than mistake. He gave the alleged victim approximately one minute and no substantive follow-up, omitted her signed account, never interviewed Plaintiff, interviewed Brandi instead, waited approximately fifteen additional days, and sought no emergency separation while Plaintiff and McKinze continued openly living together.

76. After the unsupported fear-caused-call statement and the other challenged assertions are corrected and the material omissions supplied, the record does not establish a fair probability that Plaintiff intentionally or knowingly threatened McKinze with imminent bodily injury while using or exhibiting a deadly weapon. On the corrected presentation, probable cause did not exist.

**E. Arrest, publication, and immediate consequences**

77. Plaintiff was arrested at the residence on July 25, 2024, booked, detained, and required to post a $50,000 bond. He paid approximately $5,000 in nonrefundable bond-premium expense. Plaintiff was not driving at the time and does not attribute a separate August vehicle impound to this July warrant arrest.

78. Plaintiff alleges that available patrol-car, body-camera, transport, booking, jail, and magistrate footage captures his immediate confusion about why he was being arrested, his repeated statements that he had not assaulted anyone, and his effort to understand what officers meant by aggravated assault with a deadly weapon.

79. Before releasing Plaintiff, jail or bond personnel delayed while determining whether he could return to the residence with McKinze. Plaintiff was ultimately permitted to return to the same home with her.

80. Upon information and belief, BPD or jail personnel did not separately notify McKinze, the person identified in BPD records as the victim, of Plaintiff's release. McKinze already knew because she helped arrange his release. Brandi, the remote caller and listed witness, was contacted and told Plaintiff was being released. Plaintiff is unaware of any designation by McKinze authorizing Brandi to receive victim-release notice. The incident is pleaded as later evidence that authorities continued treating Brandi as the operative complainant or source.

81. A local news outlet published a police-sourced account reporting that Plaintiff threatened McKinze with a knife and fled. The editor later told Plaintiff that the wording came "word for word" from BPD and that BPD would have to correct its account before the outlet would publish a correction.

82. Plaintiff does not plead reputation as a freestanding constitutional tort. He pleads humiliation, reputational injury, employment harm, and community branding as consequential damages resulting from the warrant-based arrest and police-created narrative.

83. On August 22, 2024, opposing counsel used the aggravated-assault arrest and $50,000 bond as a central argument against Plaintiff's request to reduce supervised visitation in a pending family case. The motion was denied. Plaintiff does not ask this Court to review that ruling; he pleads the documented use of the arrest as consequential harm.

84. The knife narrative also reached Plaintiff's young son, who later asked during supervised visitation whether Plaintiff had chased or tried to stab McKinze with a knife. Plaintiff pleads injury to his relationship with his son as consequential emotional damage, not as a request for custody or visitation relief.

**F. Post-arrest denials and refusal to correct**

85. After posting bond, Plaintiff personally demanded an interview with Wells. Wells's report records Plaintiff's contemporaneous explanation that the disagreement involved McKinze's family, that McKinze called Brandi concerning her brother, that Plaintiff cursed at Brandi while she was on the telephone, that Plaintiff left when Brandi announced she was calling police, and that Brandi was not present and could not see what happened. Plaintiff's account of the wood contact is that the kennel was metal, a separate board rested on top, and he placed the knife into the board twice because the first placement did not remain. Wells had never sought that account before obtaining the warrant.

86. Plaintiff also told Wells that McKinze had denied during the July 8 call that any assault occurred. That documented post-arrest account is consistent with Plaintiff's firsthand recollection of standing beside McKinze during the one-minute call and shows that he raised Wells's minimization immediately, not for the first time in this litigation.

87. On July 31, McKinze personally went to BPD and submitted a lengthy written statement stating that Plaintiff had not threatened or harmed her, that no crime had occurred, and that Brandi was the source of the false accusation. McKinze stated that she had not been coerced and wanted the charge dropped.

88. The officer receiving McKinze's denial inserted speculation that she might be more concerned about regaining custody of her children and willing to tolerate certain situations, while admitting that the explanation was only speculation. The addition preserved an inference of Plaintiff's guilt even as the alleged victim directly denied the offense and denied coercion.

89. On August 5, during a separate incident, responding officers documented fresh red welts on Plaintiff, no visible injuries on McKinze, and McKinze's admission that she struck Plaintiff

with an extension cord and threw vodka into his eyes. Officers arrested McKinze. Those facts did not retroactively decide the July warrant question, but they created BPD records inconsistent with Fuller's later portrayal of Plaintiff as the one-directional physical abuser in every relationship.

90. On August 6, Wells interviewed McKinze and documented that Plaintiff never threatened her with the knife and placed the knife into wood out of frustration. That information did not retroactively alter what the magistrate knew on July 25, but it directly contradicted the continuing police narrative and required accurate supplementation, preservation, and transmission.

91. By August, BPD possessed repeated direct denials from the alleged victim, McKinze's July 31 statement, Wells's August 6 interview, Plaintiff's post-arrest explanation, Plaintiff's documentary complaint, the absence of a recovered weapon or injury, and the original source conflicts.

92. Although Wells did not alone control a prosecutor's formal dismissal decision, Wells and BPD could correct the investigative file, transmit a complete exculpatory supplement to the District Attorney, recommend closure or withdrawal, and correct the public narrative BPD had supplied.

93. No public correction occurred. Plaintiff received no confirmation that the District Attorney received a complete corrective supplement. The police-sourced article remained unchanged and continued damaging Plaintiff's employment, reputation, and family relationships.

G. Command-level notice, summary closure, and missing records

94. On July 29, 2024, at approximately 6:03 a.m., Plaintiff transmitted an evidence-backed misconduct complaint with three attachments to the official email address used for then-Chief

Edward Kading. After receiving no acknowledgment for approximately one hour, Plaintiff separately transmitted the same or substantially similar materials to then-Assistant Chief James Fuller.

95. Plaintiff presently does not know whether the Chief personally received, opened, reviewed, or was ever shown the submission. The delivery, routing, forwarding, access, deletion, and retention records remain within the City's possession and control.

96. At approximately 9:04 a.m., Fuller responded from his official BPD account, approximately two hours after Plaintiff submitted the material directly to Fuller and approximately three hours after Plaintiff's initial transmission to the Chief's address. Those periods are maximum elapsed times; Plaintiff does not presently know when Fuller opened the materials or how much time he spent reviewing them.

97. Plaintiff's submissions challenged Wells's investigation and the police-sourced "fled" narrative and included objective records such as a timestamped store receipt, call history, and chronology. The materials identified the conflict among McKinze's signed statement, Baker's unwitnessed summary, and Brandi's remote account.

98. Fuller stated that he had read and absorbed Plaintiff's information and reviewed Plaintiff's BPD database history. Rather than address the identified source conflicts or documentary records, Fuller declared that Plaintiff had abused three women, accused him of a pattern of traumatizing women mentally, verbally, and physically, stated that the complaint held very little credibility, and announced that it "will be closed."

99. Fuller had no firsthand knowledge of the three relationships and identified no three adjudicated findings that Plaintiff had physically abused three women. His database review reflected accusations, police contacts, protective-order proceedings, and unresolved or

unadjudicated matters, not a substitute for investigating the specific defects in Wells's warrant presentation.

100. Fuller did not contact Plaintiff for clarification, conduct a documented interview of McKinze, question Wells or Baker about the discrepancies, request further evidence, assign a complaint or Internal Affairs number, refer the matter for a documented investigation, issue factual findings addressing the challenged warrant statements, or provide an appeal procedure.

101. Plaintiff immediately disputed Fuller's conclusions and requested meaningful review. Chief Kading did not respond. Plaintiff received no complaint number, Internal Affairs number, forwarding information, acknowledgment of formal intake, status notice, investigative findings, or record showing that the complaint entered BPD's ordinary accountability process.

102. Plaintiff's July 29 submission also contemporaneously reported that McKinze had told him Brandi attributed to Wells a statement that police had been trying to find something against Plaintiff and had finally found something that would “stick.” Plaintiff pleads this as a contemporaneously reported allegation requiring discovery, not as an established direct quotation presently proved by admissible firsthand evidence.

103. When BPD later produced the investigative file, the complete complaint and supporting materials Plaintiff had transmitted to command staff were not present. The production did not identify whether the materials had been received by the Chief, forwarded, attached to incident 24-001180, retained in a separate complaint file, deleted, excluded from production, or handled outside the Department's formal records systems.

104. The absence of a tracking number, referral record, status communication, findings, and the submitted materials from the produced file supports a reasonable inference that the complaint was handled outside ordinary accountability channels or was not preserved as part of the official

investigative record. Plaintiff does not presently allege, without discovery, that Fuller personally deleted the submission or prevented the Chief from receiving it.

105. The known sequence supports a reasonable inference of two-stage institutional conduct: Wells first constructed a materially strengthened warrant narrative from conflicting sources; command staff then received evidence challenging that construction, closed the complaint summarily, created no apparent formal investigative trail, and later produced a file from which Plaintiff's submission and attachments were absent.

106. Discovery is necessary to determine whether the Chief's email system received the original submission; who opened, accessed, forwarded, redirected, archived, or deleted it; when Fuller received and reviewed the materials; every official who discussed them; whether the materials were attached to the criminal incident, a citizen-complaint file, or an Internal Affairs system; and why they were absent from the file later produced to Plaintiff.

**H. The continuing Brandi-Wells source relationship**

107. Brandi's role did not end with the July interview. On September 10, 2024, Brandi initiated a separate harassment report against Plaintiff. A BPD call sheet states: "RP HAS BEEN WORKING WITH 620 REGARDING PREVIOUS CASES." "RP" referred to Brandi, and badge 620 belonged to Wells.

108. The official wording indicates an ongoing source-detective relationship involving previous cases, not a single isolated July interview. Together with the allegation that Brandi, rather than McKinze, was notified of Plaintiff's release, the notation supports discovery into why BPD repeatedly treated the remote caller as the operative source, when the relationship began, the number and subjects of communications, and whether Brandi supplied information outside preserved reports.

109. The notation does not by itself establish that Wells directed Brandi to fabricate information. It reinforces the inference that Wells's decision to elevate her uncorroborated allegations, omit McKinze's signed account, and exclude Plaintiff from the pre-warrant investigation was deliberate or recklessly one-sided rather than an isolated mistake.

110. The ongoing relationship also bears on command handling. Fuller claimed to review BPD's database history while BPD records later described Brandi as working with Wells regarding previous cases. Plaintiff alleges that Fuller supported Wells's handling and, on information and belief, knew or recklessly failed to learn of the continuing source relationship. The timing and scope of command knowledge are proper subjects for discovery.

**I. Recurrence after notice: the Marcus matter**

111. On August 9, 2024, BPD officers responded to a landlord-tenant dispute at adjoining residences on 14th Street. Marcus Berniard was Plaintiff's and McKinze's landlord. Isaac Buendia was moving items from his grandfather's truck. Travis Blackstock was Marcus's friend.

112. The original report documented the existing eviction dispute. Marcus told the responding officer that Plaintiff made no threatening statements and only stood on Marcus's property while holding a makeshift tool described as a machete attached to a broom handle. Marcus placed Plaintiff and Isaac approximately ten to fifteen feet away.

113. Isaac told officers that Plaintiff and Marcus never exchanged words and that Isaac was moving objects from his grandfather's truck into the residence. Isaac also directed officers to a recent service call in which Marcus had allegedly followed McKinze for approximately an hour and eventually threatened Plaintiff through her. That prior confrontation, together with the active eviction and property dispute, gave Marcus a concrete motive to portray Plaintiff as dangerous.

114. Plaintiff told officers he had moved items from the truck or recreational vehicle into the residence, left to pick up his sixteen-year-old daughter, J.A., and returned. During the police response, officers secured the residence, ordered Isaac and McKinze outside while an officer held a service weapon at low ready, and placed them in handcuffs. Plaintiff remained inside until J.A.'s mother arrived, ensured J.A. could leave safely, and then exited and was detained. J.A. did not witness the underlying encounter; she witnessed the police response and her father's detention.

115. After interviewing the persons then available, officers released everyone, separated the parties, warned them to communicate civilly, made no arrest, and filed no immediate aggravated-assault charge. The original disposition documented no criminal offense.

116. The landlord dispute, eviction proceeding, and Plaintiff's property retrieval were completed in August. Plaintiff later had a calm direct interaction with Marcus while retrieving property without a new threat, assault, or police call.

117. On November 15, 2024, Wells created a supplement already labeled "CRIMINAL OFFENSE - Agg Assault W/Deadly Weapon" before he obtained the November 18 interviews from Marcus and Travis.

118. On November 18, Marcus changed the emphasis of his account and said he had feared two armed men and wanted charges. Travis supplied a materially escalated account, claiming Plaintiff and Isaac yelled, walked toward Marcus with weapons, forced a retreat, and initiated the confrontation. Yet Travis also said he had been walking toward the residence and ran up only after seeing the parties moving toward Marcus, limiting his ability to know how the encounter began.

119. The later accounts conflicted with Marcus's original statement that Plaintiff made no threatening statement and Isaac's original statement that Plaintiff and Marcus never exchanged words. Neither Marcus nor Travis accounted for Isaac's grandfather, who transported Isaac, was present, knew Marcus through Marcus's late father, and calmly interacted with Marcus.

120. Wells did not interview Plaintiff, reinterview Isaac, contact Isaac's grandfather, examine the completed eviction history, investigate the prior-day report that Marcus followed McKinze and threatened Plaintiff through her, reconcile the August no-offense disposition, explain why the original statements were wrong, or identify new physical evidence.

121. Wells concluded that Plaintiff and Isaac confronted Marcus while armed and forwarded the matter to the Brown County District Attorney as aggravated assault with a deadly weapon. Plaintiff was not arrested on the second matter and did not know Wells had revived it while the investigation was occurring.

122. By November 2024, the District Attorney possessed two separate aggravated-assault-with-a-deadly-weapon matters generated by Wells. In each, a source with an apparent personal motive supplied an escalated accusation; Wells selected inculpatory details, failed to interview Plaintiff, failed to reconcile contrary contemporaneous evidence, and developed the matter toward the same felony label.

123. Neither matter resulted in an aggravated-assault indictment or conviction. The matters were later listed as taken into consideration in connection with a separate disposition. Plaintiff pleads the second matter as circumstantial evidence of Wells's state of mind, recurring method, absence of mistake, command notice, and municipal causation. Plaintiff does not plead it as a separate Fourth Amendment seizure because it did not produce a separate arrest.

**J. Municipal structure, complaint handling, and notice**

124. Brownwood operates under a council-manager form of government. The City's published structure places the Police Department beneath the City Manager, and the precise allocation of final policymaking authority over police administration, warrant supervision, evidence retention, and officer complaints will be established through the then-operative charter, ordinances, civil-service rules, general orders, written delegations, and discovery.

125. Brownwood publishes or has published a police-complaint process directing officer-conduct complaints to command staff and an Internal Affairs function. Plaintiff transmitted his evidence-backed complaint to the Chief's address and to Fuller. Fuller responded for BPD, announced closure, and Plaintiff's immediate objection produced no known referral, higher review, correction, tracking record, or preservation confirmation.

126. Plaintiff does not allege that Fuller's rank alone automatically made him the City's final policymaker. Fuller is pleaded as the command officer who actually reviewed and closed the complaint, as a source of actual departmental notice, and as evidence of the policy or custom BPD applied in practice.

127. Plaintiff pleads municipal liability in the alternative. Discovery may show that the City Manager, Council, Chief, or another legally authorized final policymaker adopted or authorized the complaint-review and warrant-supervision practices applied here; that final authority over the defined subject was lawfully delegated and not meaningfully reviewable; that an authorized policymaker knew of and approved Fuller's closure and its guilt-based rationale; or that a persistent custom existed with actual or constructive policymaker knowledge.

128. The concrete sequence supports that inquiry: Wells's selective warrant presentation; omission of the primary signed eyewitness account; insertion of the unsupported fear-caused-call

fact; elevation of Brandi's remote account; Plaintiff's prompt command complaint; Fuller's rapid guilt-based closure; uncertainty whether the Chief received the complaint; absence of an Internal Affairs number or findings; absence of Plaintiff's attachments from the later file production; the later Brandi-Wells notation; failure to correct after McKinze's direct denials; and Wells's later conversion of a no-offense landlord dispute into a second aggravated-assault referral.

129. Those facts do not by themselves conclusively establish an official City policy. They plausibly support targeted discovery into complaint routing, delegated authority, policymaker knowledge, prior similar complaints, warrant-review practices, source handling, evidence intake and retention, communications among Brandi, Wells, Fuller, and the Chief, the location or deletion status of Plaintiff's attachments, and the November reopening.

## VI. CLAIMS FOR RELIEF

COUNT ONE - Fourth Amendment Judicial Deception and Unreasonable Seizure (Against Wells)

130. Plaintiff incorporates the preceding paragraphs.

131. The Fourth Amendment prohibits an officer from knowingly or recklessly including materially false statements or omissions in warrant materials when the corrected presentation would not establish probable cause. Franks v. Delaware, 438 U.S. 154, 155-56, 168 (1978); Malley v. Briggs, 475 U.S. 335, 341-45 (1986).

132. Fifth Circuit law requires a corrected-affidavit analysis and permits liability where an officer supplied or contributed materially misleading information for use in the warrant process. Winfrey v. Rogers, 901 F.3d 483, 494-95 (5th Cir. 2018); Melton v. Phillips, 875 F.3d 256, 262 (5th Cir. 2017) (en banc); Terwilliger v. Reyna, 4 F.4th 270, 281-84 (5th Cir. 2021); Hughes v. Garcia, 100 F.4th 611, 622-28 (5th Cir. 2024).

133. Hughes is particularly instructive at the pleading stage: specific allegations that officers omitted critical information from reliable accounts while presenting a dominant narrative from a demonstrably unreliable source can state a Franks claim, and liability is not limited to the person who physically drafts every sentence of the affidavit.

134. Wells caused Plaintiff's seizure by preparing, signing, supplying, or presenting the materially misleading facts used to obtain the aggravated-assault warrant.

135. Wells acted deliberately or with reckless disregard for the truth by omitting the Statement of Facts personally written and certified by the only accusing eyewitness; failing to disclose the immediate conflict between that statement and Baker's report; and building the warrant primarily from Baker's materially different secondhand account and Brandi's remote, interested, and uncorroborated allegations.

136. Wells further acted deliberately or recklessly by stating that fear caused McKinze to call Brandi even though no source supplied that fact; selecting the waistband, advancement, precise-distance, coercive-purpose, and refusal-and-retaliation assertions; removing "or move out"; converting "stabbed some wood" into a retaliatory attack on a wooden kennel; using Brandi's unidentified-source motive statement; and repeating quotations, opinions, and predictions found in no other account.

137. Wells's investigative choices support deliberate or reckless selection rather than negligence. He gave the alleged victim approximately one minute and no substantive follow-up, omitted her signed account, never interviewed Plaintiff before the warrant, interviewed Brandi instead, waited approximately fifteen more days, and did not reconcile the accounts or seek emergency separation while Plaintiff and McKinze openly continued living together.

138. After the challenged statements are corrected and the material omissions supplied, the warrant record contains no coherent facts establishing that Plaintiff intentionally or knowingly communicated a threat of imminent bodily injury while using or exhibiting a deadly weapon. The corrected presentation did not establish probable cause.

139. Wells's conduct caused Plaintiff's arrest, booking, detention, bond obligation, nonrefundable bond expense, emotional distress, reputational injury, lost earnings and earning capacity, and consequential family-related harm.

140. The right not to be arrested through deliberately or recklessly false or materially incomplete warrant materials was clearly established long before July 2024. A magistrate's signature does not shield an officer who materially misleads the magistrate.

COUNT TWO - Municipal Liability Under Monell (Against City of Brownwood)

141. Plaintiff incorporates the preceding paragraphs.

142. A municipality is liable under Section 1983 when an official policy, persistent custom, decision or ratification by an authorized final policymaker, or deliberately indifferent failure to train or supervise is the moving force behind a constitutional violation. Monell v. Department of Social Services, 436 U.S. 658 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988); Piotrowski v. City of Houston, 237 F.3d 567, 578-80 (5th Cir. 2001).

143. Plaintiff's evidence-backed complaint was transmitted directly to the Chief's official address and to Fuller. Fuller responded in his official capacity, claimed to have reviewed departmental database history, adopted a guilt-based rationale unrelated to the documentary defects raised, and closed the complaint without known Internal Affairs review, interviews, findings, or preservation of the submitted attachments in the official file.

144. Plaintiff does not allege that Fuller's closure alone automatically binds the City. Municipal liability exists if discovery shows that a legally authorized final policymaker adopted or authorized the relevant practice, delegated final authority, knowingly approved Fuller's decision and its stated basis, or maintained a persistent custom with actual or constructive knowledge.

145. The City received actual command-level notice within days of the arrest. After that notice, BPD did not correct the warrant narrative, establish a formal complaint record, confirm preservation and transmission of Plaintiff's materials, correct the police-sourced publication, or prevent Wells from repeating the same method. By November, Wells had generated a second aggravated-assault referral from a matter originally closed without an offense.

146. The later BPD notation that Brandi had been working with Wells regarding previous cases, combined with Fuller's claimed database review and affirmative closure, supports discovery into whether command staff knew of and approved the source relationship and its use in Plaintiff's cases.

147. Plaintiff pleads municipal causation in the alternative. If an authorized final policymaker reviewed and approved Wells's challenged warrant decision, Fuller's guilt-based closure, or the practice of keeping evidence-backed complaints outside formal channels, that approval and basis are attributable to the City. If the City maintained an official practice or persistent custom of tolerating materially misleading warrant presentations, failing to preserve and transmit exculpatory corrections, or closing complaints through accusation-based database review, that policy or custom was the moving force behind the constitutional injury.

148. To the extent the municipal theory depends on failure to train, supervise, discipline, preserve evidence, or correct, Plaintiff will prove deliberate indifference to a known or obvious

risk of materially misleading warrant practices. Fuller's summary closure, the missing institutional trail, the failure to correct after repeated notice, the continuing Brandi-Wells relationship, and the November recurrence are pleaded as circumstantial evidence of notice and deliberate indifference.

149. Plaintiff will establish the relevant policymaker, policy, delegation, custom, retention practice, and causal connection through discovery and competent evidence.

## VII. QUALIFIED IMMUNITY

150. Wells is not entitled to qualified immunity at the pleading stage because Plaintiff alleges a violation of the specific and clearly established Franks rule, not a generalized right to a perfect investigation.

151. Plaintiff identifies the exact charging theory and challenged warrant language; the wrong offense dates; the omitted signed eyewitness statement; the immediate conflict with Baker's report; the unsupported fear-caused-call statement; Brandi's remote and uncorroborated allegations; the approximately one-minute victim contact; the failure to interview Plaintiff; and the omitted contrary records. These allegations require a factual record rather than dismissal based on the uncorrected warrant narrative.

## VIII. DAMAGES

152. As a direct and proximate result of the constitutional violation, Plaintiff suffered arrest, booking, detention, loss of liberty, and the burdens associated with felony legal process.

153. Plaintiff incurred a $50,000 bond and approximately $5,000 in nonrefundable bond-premium expense. He does not seek in this Count to attribute an unrelated later vehicle impound to the July warrant arrest.

154. Plaintiff suffered humiliation, anxiety, chronic hypervigilance, sleep disruption, fear of unexpected arrest, emotional distress, loss of enjoyment of life, and loss of security in his home and community. The later generation and continued circulation of aggravated-assault allegations intensified that fear.

155. Plaintiff suffered reputational injury, inability to obtain stable employment, past and future lost earnings, and loss of earning capacity as consequential damages from the warrant-based arrest, police-sourced publication, and continuing public association of his name with aggravated assault. He lost remodeling work after arrest-related disruptions caused his employer to state that Plaintiff had become more trouble than he was worth.

156. Because Plaintiff's young son resides in Brown County and Plaintiff remains in the area to preserve that relationship, the local and continuing branding has an especially severe effect on employment prospects. Plaintiff relied on assistance from Jack Davis for housing and basic support and fell approximately $8,000 behind in child-support obligations. The arrears are pleaded as evidence of financial consequences, not as a separate duplicative recovery.

157. The arrest and $50,000 bond were used at the August 22, 2024 family-court hearing concerning supervised visitation. Plaintiff has incurred approximately $8,000 in supervised-visitation expenses and alleges that a substantial portion of the continued expense and lost parent-child time was foreseeably aggravated by the felony arrest narrative. Plaintiff seeks damages only and does not request review or modification of a family-court order.

158. The police narrative harmed Plaintiff's relationships with both his young son and his teenage daughter in different ways. His son absorbed the accusation and questioned whether Plaintiff had tried to stab McKinze. J.A., then sixteen and struggling with anxiety, experienced the later armed police response, saw Isaac and McKinze in handcuffs, and left while her father

was being detained and protesting that no crime had occurred. Plaintiff does not seek J.A.'s independent damages; he pleads his own emotional distress and injury to the parent-child relationship.

159. Plaintiff seeks nominal damages where required, compensatory damages for actual injury, and punitive damages against Wells because the alleged conduct showed reckless or callous indifference to Plaintiff's federally protected rights. Plaintiff does not seek punitive damages from the City.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. enter judgment in Plaintiff's favor on the claims proved;

B. award compensatory and nominal damages in amounts determined by the jury;

C. award punitive damages against Wells in an amount determined by the jury;

D. award reasonable attorney's fees if incurred and recoverable under 42 U.S.C. Section 1988, together with taxable costs;

E. award pre-judgment and post-judgment interest as allowed by law;

F. enter appropriate declaratory relief to the extent supported by Article III and the evidence; and

G. grant all other relief to which Plaintiff is entitled.

## X. JURY DEMAND

160. Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

________________________________
Kevin Wayne Ashby, Pro Se
1905 12th Street
Brownwood, Texas 76801
Telephone: (325) 214-7503
Email: kevinashby222@yahoo.com